First case up this morning is 4170932. Entering Marriage of Jennifer Miller and Alan Miller. For the Appellant is Kelly Ellen Gordon-Yoshima. For the Appellee is David Eugene Liefers. Is that pronounced correctly, sir? Liefers? Okay. Miss Gordon, you may proceed. Okay. May it please the Court. Counsel. Today on appeal, I have five issues. The first issue is whether or not the trial court erred in denying my client maintenance. The second issue is whether or not the trial court erred in allocating the assets and debts. Go back to the first issue, denying your client's what? Maintenance. Maintenance. Okay. The third issue, whether the trial court erred in failing to order Alan to provide life insurance. The fourth issue, whether the trial court erred in not allocating racist medical expenses between the parties. And five, whether the trial court erred in not ordering Alan to pay any part of my client's expenses. With regards to the first issue, the trial court denied my client maintenance. The standard review in a maintenance case is abuse of discretion. In this case, the trial court abused its discretion in denying my client maintenance. The first factor that the court must look at is the income and the property of each party. If you look at Jennifer's income, her income at the time of trial, Exhibit 26A, extrapolated over the year because we took a pay step from October of 2016. If you extrapolate that throughout the year, her income was going to be a little over $18,000 that year. And looking at Alan's income, he was employed with Ameren. His income with Ameren taking out the bonus that he received, so not including the bonus, if you extrapolate his income, it was going to be $129,000. And then you would also have to add to this, they had a fourplex in Jacksonville and he was getting income from that. So adding that, another approximately $4,500, his income for the year was going to be $133,000. Now that's a difference of $115,000. So the disparity in income is large. And when you look at the reasoning under this factor that the court gave, one of the reasons he said that this factor did not substantiate Jennifer's request for maintenance was because at some point Alan might retire and at some point her income might go up. I don't believe these were appropriate conditions to look at. They weren't brought up at the trial. Two questions about all this. The first question is, the standard review in this case is abuse of discretion, is it not? It is, Judge. That's a pretty high hurdle to overcome. I understand, Judge. And I think if the court, if the appellate court looks at each of these factors and sees how the court ruled on the factors, I think this court would find that, in fact, the trial court did abuse its discretion. The next question is about the circumstances of your client. As I recall, she is, correct me if I'm wrong, not currently employed but seeking employment, is that it? No, that is not correct. My client was working part-time. She was working approximately 16 hours a week. Now, she was working those 16 hours a week, but she was also going back to school. She wanted to do the bridge program to go from an LPN to an RN. You've refreshed my recollection, yes. Okay, so, but the point is, there's the possibility of a better position, greater income in the future? Yes, especially if she were to get into the RN program, the bridge program they call it, and then become an RN. There would be. But that's not what it was at the time of the hearing. Well, that's one of the questions that comes up in cases of this kind, and that is, people's lives aren't static. So when the court is called upon to evaluate the need for maintenance and the amount for maintenance, how should the court do that? That is, it's kind of like a picture in a race. You can take a picture, but people are still moving. So the question is, should the court have looked at this situation as it is at the moment, decided your client needs maintenance until she gets this position she hopes to get, and then this is always subject to review, is it not, of a change of circumstances? Correct. But I suppose the argument is, until that happens, she's entitled to maintenance, and if it happens, then? File a motion. File a motion to review. Substantial change. Her income has increased. She got new employment. She got a new degree. Was this, what I've just mentioned to you about all this, was this discussed or argued to the trial court? How did the trial court address it? It was. Not his retirement. His retirement, as I recall, was not discussed. My client, yes. Say it again. His what? His retirement was not discussed. My client, doing the bridge program, was thoroughly discussed. I mean, I went through. I even had an exhibit showing how much it was going to cost to attend the program if she got into it. Did you have an exhibit showing what her income was likely to be if she did? No, Judge, because at that time it was speculative, and I thought it would be objected to as being speculative at that point. She was working at Memorial as an LPN, and she wanted to go back. They were working with her. They knew that she was trying to go back to school to get her RN, so they were actually working with her on her hours so that she could continue to work at a PRN basis and go to school. She was also doing some math tutoring because she needed to test out of two math classes. My question wasn't good enough. I wasn't clear. Okay. What I was really asking for is did the court discuss, and parties argue, the question about making a maintenance determination based upon the circumstances of your client right now, she needs her maintenance right now, as opposed to her hope for the future in the program she's in? The very point you made now, and then, you know, if she has a greater income and greater stability in her economic situation, that her former husband could seek to have maintenance reduced. Does this ever discuss? Judge, in our closing arguments, I don't believe I discussed that. I just said that she should be awarded maintenance in accordance with the guidelines. This is what that would be. I think it would be incumbent upon Alan to, if that happened, upon Alan to file a motion to modify afterwards, if she did get that program, in that program, and then got a job. Well, it seems to me this would be, you know, the question of expectations and reasonable expectations. I'm not sure. We think there would be some more specific case law on this point to direct the court and the parties on how to address this. Your client has reasonable expectations of a better economic situation in the not-too-distant future, but what does that mean for today? Right. That's really the question. Yeah, and I think you're correct. I think there is not a lot of case law out there that talks about that in terms of, I mean, there's the line of cases that talks about rehabilitative maintenance, which is maybe what you're alluding to, where, okay, you're going to get so much maintenance for a while, and then we'll review it, see if you've been rehabilitated by that time. Well, the question I'll ask Mr. Liefers, and the one that I understand in the review, it's abuse of discretion, but it seems to me if a court is supposed to make a determination on the way things are now, and the party, for instance, if it's going in order to pay maintenance in a sum appropriate to what our situation is now, can then come in later on and address it. If the trial court didn't address that or didn't make a decision on that basis, then that might, you know, the abuse of discretion is based upon an understanding that the court appropriately applied legal standards. So that will be my question when you have an opportunity, Mr. Liefers. I want to hear whether or not this legal standard was appropriately applied. You can go ahead. And then I would like to point out, too, that even in Alan's brief, he didn't say that there shouldn't be any maintenance. He said that there should be a deviation of maintenance, and that maintenance should be $1,000 per month. So even opposing counsel got past the first prong of deciding whether or not this is a maintenance case, and then from there looked at the guidelines. Counsel, Mr. Liefers says in his brief, Jennifer seeks an order prohibiting Alan from filing a motion to modify until he is age 65. Based upon your response to questions today, it sounds like that that is not your position. Am I correct? Judge, you are correct. You can always file a motion to modify. That is probably poorly worded. That should be that he shouldn't be allowed to file a motion and use as his substantial change of circumstances that he has retired until he's 65 years old. And there's – and the fear of that was because – I don't think that's really before us today, but I don't understand what you're saying. That would not be considered a change of circumstances? Is that what your argument would be? That would be my argument. Retirement. Correct. Even if it reduces his income? Correct. Wow. Is that what the case law says? Yes. Yes, Judge. There are cases, and I don't have them with me today because I didn't cite that. But yes, there are cases that say if you retire on a voluntarily basis early, that does not necessarily mean that your maintenance is going to go down because you still have the obligation to support your spouse. So retiring at age 65 is retiring early now? No, no, no. Prior. Prior to. Oh, prior. Prior to 65. Okay. My next question is – refers to your brief where you indicate, as you stated earlier, that his income was about $133,676 and hers was $18,339. You applied the formula and came up with a difference of $36,435. Is that right? Yes, that would be the mean. Okay. And so your position would be then that he should pay $3,036.26 per month in maintenance, correct? Correct. Further, your position would be that he should pay it – I'm not seeing it now, but I think you said in your briefer that he would pay that for 16 years and 11 months. How did you come up with that number? I don't see how that calculates under the statute. Judge, that was in accordance with the guidelines, the statutory guidelines. What guidelines is that? Because I can't follow it. The maintenance guidelines? Yes. The duration guidelines. Yes, the duration guidelines. And could you explain that to me? That's not the way I read that statute. Well, the way the statute is written, you take the number of years or the number of months, and then you apply – The number of years of the marriage, which in this case was about 22 years. Correct. And then you use that 22 years under the statute to come up with 16 years and 11 months. That's what I'm asking you. I don't see how that calculates. It would have been times 0.8. I thought that was for less than 20 years. And if you follow the statute, 20 years plus would be 20 years or permanency. I would have to go back and look, Judge. At the time that you're saying this, I don't recall what those – I know at the time the statute was, it was 0 to 5 years is 0.2. 5 to 10 years is 0.4. Okay. 10 to 15 is 0.6. I could be misreading it, but I think if the marriage is over 20 years, then the maintenance, unless the court deviates, would be the number of years of the marriage or it would be considered permanent. So in this case, the minimum would be 22 years. Arabelle, what I'm saying is I think you're asking this court to say that maintenance should have been awarded and that if it is awarded under the formula, your position would be it should be paid at the rate of $3,036 a month for 22 years. That sounds like a lot. No, not for 22 years. Okay. I think it would be under the statute, but 16 years and 11 months in. Yes. Okay. Yes, Judge. And you're also saying that it was already agreed. I understand what you're saying. You do? Yes, I understand. Okay, great. You also indicate that it was agreed by your opponent to pay $1,000 for five years. Is that right? Not agreed. That's what he put in his brief. But yes. Well, suggested it. Yes. Was there ever an argument that maintenance should not be paid? No, there was not. How did the court then decide not to award any maintenance is, I guess, a question for a payment counsel, not you. I can't answer that question. But in any event, you would reject $1,000 per month for five years. Correct, Judge. And your rejection would be because it does not follow the formula under the statute. Yes, Judge. Could it be that the court, in looking at the guidelines, found that the amount that the court would have to award under those guidelines was totally unfair and, therefore, made a decision not to award maintenance at all? Would that be a proper consideration for the trial court to have made? No, Judge. Why not? Well, because the way the maintenance statute, the new statute is set up, before you even get to the guidelines, you have to make a finding of whether or not maintenance is appropriate. I understand that. But the trial court certainly can read a couple paragraphs further down. Oh, definitely. Down in the statute that if that determination is made, here's what's going to happen. Right. And the court should disregard that, according to you. And you very well may be right. If the decision is made that maintenance is required, then the amount is not the court's concern because that is statutorily governed,  Right. Exactly, Judge. And here's what I'm trying to get to. Good reason to deviate would not be that the trial court considers the amount required to pay was, in his judgment, outrageous. That would not be a good reason to deviate. That's what I'm asking. Would it be? Would it not be under the case law? Realizing that there isn't a lot of case law on this. Right, Judge. The court then has, if it makes that determination, then the court can deviate. And it can deviate anywhere between a dollar all the way up to $3,336. So if we decided that maintenance should have been awarded, the court could deviate from your proposal of $3,036 a month for either 16 years and 11 months or 22 years, whatever the case may be, all the way down to $1,000 per month for five years. Yes, Judge, the court could do that. And you think that would be just? No. No, I don't agree with that. I've taken enough of your time. Please continue. And I'm sorry if I'm not answering your question appropriately. No, I think you are. But, no, I mean. I just wanted to make sure I understood. I think the trial court, and understandably, and I'm sure that the trial court judges do this, they might look at what those maintenance calculations would be, and they do it backwards, and then they go back and they figure out maintenance. That's not how the legislature wrote that act, and that's not why the act was done that way. The act was done so that you first look at, is it a maintenance case? And then you do the guidelines. Judge, did you file a petition to reconsider after the maintenance was denied? No, Judge, I did not file a post-trial motion. Okay. And here's my other question is, to the trial court's credit, we have been favored with a lengthy court order explaining what the court did and why. And paragraph three of it addressing maintenance and the factor, which is described in the statute as present and future capacity. The court wrote this. Jennifer is and has been employable, but she has chosen not to pursue full-time employment. There are no reasons placed in evidence to allow the court to find she cannot be a full-time employed individual. What's that all about? Well, Judge, that's definitely what he said. But if you look at the case law, the case law looks at, if you look at Selinger, if you look at Shager, sorry if I'm pronouncing that wrong, but both of these cases said even if a spouse is employable and is employed, if they're not making the amount of money to live up to their lifestyle, then there should be a ward of maintenance. Again, I apologize. I asked the question knowing what I meant, but it's not what I said. So let me clarify. The question is, what evidence was presented to the court about Jennifer's choosing not to pursue full-time employment? He says there was no evidence presented to that at all. Was this evidence presented or discussed by you? Yes, Judge, it was. And again, it was in the same line that I was just talking about before. She was only working part-time because that's all she could work because she was going to school. She was doing tutoring. She was taking care of the older child or the 17-year-old child. So that's why she was only working part-time on a PRN basis was because she was going to school. She was still working. I mean, this isn't, Jennifer isn't the person that's sitting at home waiting to get maintenance. She was working as much as she could. Her testimony was any time they called her to work, she went in and worked. She would take ice packs because of some of her medical conditions and put them on her legs and hands just so she could get in and work and make money. Well, in the next paragraph, the court seems to be picking up on the same thing, that this was an election by her. Yes, the court made that reference several times. It was an election by her. She chooses to, if she could have earned, allow her to earn a living, if she chooses to be employed or pursue such employment, does not place an obligation upon Allen to support her based upon her choice not to work. In short, there's no credible evidence presented to the court. The warrant of fine, Jennifer, is forcing the court to go forward and delay her education. You're saying, no, that's not what the evidence shows? No. If you look in the record, Judge, you're going to find that my client was working part-time, but she also, like I said, was going to school. She was taking care of the 17-year-old. She was tutoring. So another question is, with regard to any evidence of a particular point, there are two ways to deal with that. One, it could be that there's conflicting evidence, or two, there's some reason that the trial court is prior fact and didn't believe your client. First, was there any conflicting evidence? No. There was no conflicting evidence that my client was working part-time. There's no conflicting evidence that she was going back to school, no conflicting evidence that she was taking care of the 17-year-old. Okay. Thank you, counsel. You'll have an opportunity to address this again in rebuttal. Mr. Liefers? Counsel? Counsel. Well, rather than jump into my presentation, I just thought I'd go ahead and open it up for questions, because it appears that your honors have multiple questions regarding this case. Well, Ed, what about the ones I was just talking about now? It seems that, for whatever reason, the court made it pretty clear that it thought maybe slacker would be too harsh a term, but that's a reasonable description of how the court viewed Ms. Gordon's client. What's the basis of that? I think with the court, my reading of what Judge Cherry wrote is that he implicitly recognized that Jennifer has a duty to try to become self-supporting. The evidence was that in 2010 or 2011, after she had previously received her CNA certification, she became an LPN. And it wasn't until later about the time that she filed for a divorce, which was in 2014, that she'd go to work for Memorial Medical Center by her choice on a part-time basis. At that time, she wasn't involved in any bridge program or RN program. The evidence was that, and I specifically asked Jennifer a line of questions about, for example, where do you work? How many hours do you work? I think she testified she worked 16 hours every other week. Now, keep in mind, the only child left at home at that time was Grace, who at the time of trial was 17 and a junior in high school, had her own car. So there wasn't any need for her to stay at home to take care of Grace. She's fully independent, basically. I asked her since 2014, have you applied for any full-time positions at Memorial Health System in Jacksonville? And she said she had applied for two, but didn't get accepted for either one. I asked her whether or not she had applied with any health system outside of Memorial. And she said no, that she was happy with Memorial and that's where she intended to stay. So I think what the judge thought was that, number one, she's already got an LPN certification. Number two is even at 16 hours every other week, and I disagree with counsel, extrapolated, she would make about $25,000 a year. So if you think about that, if she goes from 16 hours every other week and works 80 hours every other week, that's almost a five times difference. I think Judge Cherry felt that she was very employable. She hadn't made anything but a minimal effort to try to be self-sustaining, and that's why he wrote what he wrote. Let me go back to the question I said I was going to ask you and ask you directly now, and that is the business of assessing maintenance, dealing with literally a moving target. Oh, absolutely. It needs change, and we have Ellen's income at a certain amount, but over time it might very well diminish, as the trial judge said. Jennifer's is a certain amount now, and in a few years it might be greater. How should a judge assess all of this in determining maintenance? I just had to be clear in my sense, and one of the nice things about having been a trial judge is I've done this stuff in the past for a long time, but it seems to me the best course of action, and maybe this is something which ought to be specifically addressed, is this. Take the parties as you find them today and make a determination regarding what maintenance is appropriate today. In the hopes that Jennifer will be able to complete her training and education and get a better position in the not-too-distant future, which would reduce her need for maintenance, that's something which when that occurs, that eventuality occurs in two or three years or whatever it is, then Ellen can seek to reduce his maintenance obligation because this is a change of circumstance, and indeed the court seems to me could make that clear and to invite such a petition if and when this comes to pass. As opposed to guessing, because who knows? If the court is making the determination about the amount of maintenance today based upon a reasonable expectation in the future, she might break a leg, get in an automobile accident, something else could happen, the job doesn't come through, and that's how life can go sometimes. So I suppose the question is why shouldn't that be the way things are done? And in this case, was that the way things were done? Well, I think it's reasonable for a trial judge, particularly one that sits and listens to the evidence and have an opportunity to sort of gauge the people that are involved. I think in, well I'll put it in specific terms in this case, I think it was reasonable for Judge Cherry to look at the reality that Jennifer had this certification and that she could be employed on a full-time basis at this point. If we would rather narrowly look at the exact facts without some look into the future, if you will, then I think what that type of approach would also invite would be people in Jennifer's, and I'm not talking about her in particular, but in Jennifer's situation, what's the purpose of going on and getting my education? Counsel, I'm drawing maintenance. One of the points that we haven't discussed in this equation, and maybe I'm wrong, but it looked to me like the trial court relied heavily upon its distribution of marital assets and felt that because of the significant amount of, in the court's mind, the significant amount of marital assets being given to the wife, that that was too offsetting a need for maintenance. I certainly don't know that he thought it was, let's say, 100% offset, if you will, but he certainly thought, as he should, that it was a factor which supported his conclusion. But of those assets, which of them were readily liquidatable? Liquidatable? Well, we certainly wouldn't want her to sell her house, which, by the way, had zero mortgage. She was awarded $291,000 in retirement benefits, and we know there are pros and cons in that, and plus Alan was ordered to pay her an equalization payment of about $22,000. So, I mean, that's obviously liquidable. And she also received some liquid assets, but not, I mean, like bank accounts, but it wasn't that significant. But that was the bulk of what she was awarded. She was awarded in that marital estate about $434,000 of memory service. But of that, how much of it was she expected to liquidate in order to maintain herself? Well, you know, Your Honor, that's pretty hard to say, and the reason I say that is that Jennifer presented her testimony and her financial affidavit in order to show her needs, all right? And Judge Cherry specifically found that her testimony was less than credible with regard to her needs as represented in the affidavit. And so it's pretty hard for me to say if she has a real need to go into those funds, but to answer your direct point, there are, other than the $21,000 equalization payment and some minor bank accounts, there aren't really any liquid assets that wouldn't require some tax consequence involved in that. I was under the impression, going back to the question I asked you, and maybe it's not a direct one, so you can address it, that when you're talking about Jennifer's going to work full-time and how it was appeared by, or looked at by the court, that Ms. Gordon seems to be arguing that this would have been, these are essentially mutually inconsistent positions. That is, she could not have pursued the education she wanted to get this better position, a higher-paying job, if at the same time she had to be working full-time. Now, maybe that's an incorrect understanding of the facts of what the trial court said, but you heard Ms. Gordon's argument, and so really that's the point I want to focus on. Is this, does the record demonstrate that she could have pursued this education, occupational step up, and still have worked, maybe not full-time, but certainly more than she did? What about that? Well, the reason I smiled is that I think we come from a different generation. Where I worked full-time in college, I worked full-time in law school, married, that type of thing, and I think one of the things I put in my brief just at one point in time was, there is nothing in the record that would suggest that Jennifer isn't capable of maintaining a full workload and going to school. She talks about her health, and you know, certainly she's had some chronic issues over the years, but as she admitted to trial, it doesn't prevent her from working full-time. So on her schedule of working full-time and pursuing this education and training needed for occupational advancement, I'm sorry, Your Honor? Could she have worked full-time and still pursued the education and training needed for occupational advancement? There's no reason that I know of that would suggest that she could not. For instance, when did the training occur? How many hours a week and all that? I don't remember the testimony specifically, but if I recall, she was attending Lincoln Land in Jacksonville maybe two days a week at that point, and then she was doing some math tutoring on the side to see if she could get proficiency out of that. That's my recollection, but I don't remember what her specific work schedule was. I think she was at that point sort of a PRN, and it averaged out to be about 16 hours every other week. The training she was going through, was it beyond that, or was it foreseen as being beyond going to Lincoln Land in Jacksonville? Well, my recollection and understanding would be that it was essentially a program designed to bridge from the LPN program into an RN program without requiring it to be a four-year BSN, that type of thing. How long would it take before she would have her RN? She would testify that she would have had the RN by the spring of this year. That was her testimony. You handle a lot of these cases. Setting aside, and it's not an easy thing to do, this particular case, what about my musings on how trial courts should deal with the moving pictures, so to speak, taking Ulysses' snapshot and setting maintenance? Certainly. Well, like I suggested a while ago, and perhaps didn't articulate very well, I think it is sort of an approach where you take a still out of a moving picture, but you have to be cognizant somewhat of what the next frame is going to be, or could be. And I think that's what Judge Cherry did. Now, obviously, if the court were to award maintenance and there's a substantial change in circumstance, no matter what that may be, maybe an increase or decrease, then either party could file a motion to modify it. I would like to think that the trial court's decision has a little more foresight than that to make it strictly like a one-frame order. So I think that the courts need to look at the reality of the situation. Was she employable? Sure, she was employable. How do we know she was already employed? Did she go to work full-time? Sure, she could go to work full-time. Can she do what many of us have done and go to school and work? Sure, that can happen. And I think that's the way Judge Cherry looked at it, or really did. One of the concerns with what I'm suggesting is that it runs against the grain of, let's have some finality in these divorce proceedings, because then we're inviting more litigation upon a change in circumstances, which are foreseeable, and the more litigation is expensive for the parties and it's a bother for them in the court. So that is one thing that might speak against it, but I'm trying to figure out what guidance we should provide for trial courts. Well, I suppose, and I don't want to sound flippant, that if I had that kind of wisdom, I'd be sitting where you are, Your Honor. I'm designed to make arguments, not to resolve some of these issues. But again, I think with the approach where the court takes into account what's likely to happen, and what's likely to happen and could happen based upon, again in this case, Jennifer's training, I think if that's taken into account, as I think Judge Cherry did, then I think it's less likely to result in subsequent litigation. One of the things, and this is off-topic slightly, you're talking about modification and additional litigation, was Ms. Garvin's argument for this court that Allen should not be able to file a motion to modify maintenance despite a change in circumstances until he was age 65. Now, it was my understanding under the statute that non-modifiability can only come if the parties agree to it. So I asked her about that, and she says that's not her position. She understands that any would be subject to modification unless there was an agreement reached that it wouldn't be. Well, I understand that's what she said, Your Honor, in response to your question. I'm just responding to what she wrote. All right? Because I think what she wrote was that he would simply be prohibited. Okay, well, she wrote on page 17, even Allen recognized that Jennifer was entitled to maintenance, albeit only $1,000 per month for five years. He did not argue no maintenance. Correct or incorrect? Sort of. Sort of correct. Well, here was Allen's position. Let me try to explain this. I mean, and this is replete with different instances in the record. Okay? Allen was trying to help Jennifer out through this entire process. He voluntarily increased the support he was ordered to pay. Okay? He would receive, like in 2014, I think he got a moving allowance. Right, and I saw your brief. You argued that and have gone through that. Okay, but before we run out of time, you yourself then, in response to some of her arguments, in your brief, did a recalculation of what maintenance should be. If it were awarded and the guidelines in the statute were followed, you came up with monthly maintenance, I think, of $2,229.02 a month. Is that right? That sounds correct. Is your understanding in the statute that that would be for 22 years or for 16 years and 11 months as opposing counsel has represented in her brief? My read of the statute is that if it's a 20-year-plus marriage, it's either permanent maintenance or for the number of years of marriage. That's my read. That's also my read. So you then would not follow the calculation of the 16 years and 11 months as I had suggested I did not follow? I would have to look at the statute again. And very candidly, what I may be a little confused on is, is the statute as in effect today the same in that regard as it was in 2016 when the judge decided the case? I thought it used to be that in excess of 20 years, you still used a formula or percentage as Kelly suggested. And then they changed it, but I'll defer to Kelly because I know she had a lot. Counsel, before your time is up, I want to ask you about the $1,000 suggestion that you made in the trial court. My experience suggests that no matter how generous of spirit one party may be, they don't make suggestions like that just to be charitable. It's being done because the thinking is, gee, I think maintenance is going to be awarded or likely, and maybe I can suggest this figure, which would be less onerous than something else. Isn't that essentially how we should view this? And doesn't your suggestion of a $1,000 maintenance award when the court awarded nothing suggest that maybe the court messed up? No, I don't think so, Your Honor. Again, I'm not going to get to that generosity thing. I've already made a comment on that. Right. And Alan and I specifically discussed that part of the argument. I mean, basically bottom line is that we felt that the court should deny maintenance, but I wasn't to take the position that he wasn't willing to do something to help her out. I mean, that seems to be a little inconsistent. But you're an experienced lawyer. You could have said, Judge, maintenance should not be awarded, but if you can't award it, you should award $1,000 a month and no more. That's not quite what was said. That's not quite what was said. And, you know, I'm reminded about the wonderful line from Princess Bride, where he said he's not dead, he's just mostly dead. You know, and here we have kind of the equivalent argument right here. You know, it's not that you said no maintenance. You said $1,000 a month. Doesn't that suggest that the court maybe did not correctly evaluate this? The issue was… Go ahead. Please answer. The issue was before the court. The court, in its discretion, denied it. So what else can I say? Thank you, Your Honor. Thank you, counsel. Ms. Gordon. It was asked whether or not Jennifer could be going to school and working. I'd like to point out that at the time of trial, and I'm reading this from my brief so I've got the exact, Jennifer was working the 16 hours every other week. Jennifer was also taking two classes at Lincoln Land Community College, microbiology and chemistry, typical classes, and studying and receiving tutoring to test out of two math classes. And let me clarify, she wasn't in the BRIDGE program yet. In order to qualify for this BRIDGE program, she had to meet certain qualifications, ACT, and she had to already have some classes already under her belt. So these were pre-reqs to get into the RN program. She had not been accepted into that program. So she would then be on the Lincoln Land Jacksonville campus on Mondays and Wednesdays, every Monday and Wednesday, from 11 a.m. to 8 p.m., sometimes taking a break for lunch. She then would try to attend tutoring for testing out of the math classes because she was trying to get into that program in the fall. She didn't have time to take these math classes that she needed because that would set her back a whole other year. So she was trying to test out of them. In doing so, she was taking tutoring classes. So she was taking the tutoring classes for math on Mondays, Tuesdays, and the weekends, if she could. How long were those? They varied. I don't have the exact time, but if I recall, they varied maybe a couple hours each time. But that was just with the tutor. She also was studying at this time. And although the testimony was that her medical conditions weren't preventing her from working, if you look at the totality of everything, she was doing this. She was also going to doctor's appointments. And then her daughter had some medical problems too, depression and things. So she's working part-time. She's taking two classes. She's tutoring. And she's trying to take care of her health conditions and take care of her child's health conditions as well. Now what did the future say regarding continuing educational pursuits? What was the following year? What was her schedule likely to be? And how long would this training go? Yeah, let me address that. So then, as I said, she was taking these. And that would have been the fall of 16 because that's when we had the trial. So then in March of 17, that's when she would apply for the Bridge Program, for the RN Bridge Program. The RN Bridge Program, if she was admitted in March of 17, then that program would be from August 2017 until she graduated in 2018, spring of 2018. And she was going to try to work during that time. Again, she was at Memorial. One of the reasons she was only looking at jobs at Memorial in Jacksonville was because they were really working with her. They were setting her hours so that she could still go to school and give her time off to go to these medical appointments and things like that. So where do we stand right now? I guess this is beyond the record, though. If you'd like me to go beyond the record, I'm more than happy to do so. Well, no, I guess I can't. So that was her situation as it was testified to at trial. I'm sorry? That was her situation at that moment. Yes, the snapshot, as you said. In every kind of divorce case, that's what the trial court is going to look at is a snapshot. Was there evidence at trial of what the husband's income would be upon retirement? There was none. So there was evidence presented as to what her future employability might be. Correct. Was there any evidence as to what his reduction in income was going to be? No, there was not. There's no evidence. The first time that I had even seen anything about him retiring, other than in my argument that he shouldn't be able to retire early, was the judge saying that he might retire. So when the court says on page 2 of the order, going forward Allen's income will decrease upon his retirement, where did that come from in the record?  It is not in the record. But isn't that something which one can infer that if you retire, your income is going to be less? Sure, definitely. Counsel, before you run out of time, your calculations, as I understand it, did not include the provisions in B-3 of the statute. For purposes of this section, the term gross income means all income from all sources within the scope of the phrase in Section 505 of this Act, which is the child custody provision. Opposing counsel's calculation did take that into consideration. Am I incorrect when I say that you did not make your calculation based upon the definition of gross income as defined in the statute? Judge, I pulled out his bonus, if that's what you're referring to. No, that's not what I'm referring to. I'm referring to B-3. It talks about gross income and refers to Section 505. Correct. Did you take that into consideration? Yes, I did. I included all gross income from all sources. And you don't think that entails calculation of taxes at all? Is that your interpretation of this section? Gross income from all sources is gross income. No, that does not take into consideration taxes. Under Section 505? Yes. So child support does not have taxes as part of any consideration? I'm sorry. If you look at child support, the child support... It refers you to that section. Right. It refers to that section because of the long line of cases that defines gross income after child support. When they drafted the maintenance guidelines in the statute, instead of redoing all that case line, they just referred it to the child support section. So under my calculations, yes, I did include gross income from all sources. As suggested in Section 505. Okay. Okay. Thank you, counsel. We'll take this time for advisement.